924 So.2d 651 (2005)
Ex parte G.C., Jr.
(In re G.C., Jr.
v.
E.B. and D.B.).
1040001.
Supreme Court of Alabama.
July 29, 2005.
Rehearing Denied September 23, 2005.
*653 Bill G. Hall and D. Milburn Gross, Jr., of Ables, Baxter, Parker & Hall, P.C., Huntsville, for petitioner.
Dinah P. Rhodes of Rhodes & Creech, Huntsville, for respondents.
STUART, Justice.
G.C., Jr. ("the father"), appealed to the Court of Civil Appeals from a judgment awarding custody of his minor son, J.G.C. ("the child"), to E.B. and D.B. ("the maternal grandparents"). The Court of Civil Appeals affirmed the judgment without an opinion. G.C. v. E.B. (No. 2030309), 919 So.2d 329 (Ala.Civ.App.2004) (table). We granted the father's petition for certiorari review.
The evidence in the trial court revealed the following facts. The father and L.B. ("the mother") met at a Narcotics Anonymous meeting in 1998. They began a relationship that eventually resulted in the mother's pregnancy. They ended the relationship before the mother informed the father that she was pregnant; however, the father became aware that the mother was pregnant before the birth of the child in April 1999. The father and mother never married. At the time of the child's birth, the father was working out of town. The father saw the child two weeks after the child was born. Two months after the birth of the child, the father requested a paternity test, which established that he was the biological father. The mother and the child lived with the maternal grandparents for several months after the child was born. At some point, the mother moved out of the maternal grandparents' house and left the child with the maternal grandparents.
The father visited the child several times during the first year and was present for the child's first birthday. The father did not visit with the child much during the second year because he was working out of state. In August 2000, 14 months after he had learned that he was the biological father of the child, the father filed in the probate court a declaration of legitimation, requesting that he be determined to be the child's father. The trial court issued the order of legitimation, and the child's last name was changed to the father's.
In February 2002, after the mother forcibly removed the child from the maternal grandparents' home, the maternal grandparents sought temporary custody of the child. In April 2002, the trial court entered a pendente lite order, awarding the mother custody of the child and awarding the maternal grandparents specified visitation. The father received notice of that order and subsequently intervened in the proceedings. As a result, he was awarded regularly scheduled visitation with the child.
In August 2002, the mother, father, and maternal grandparents entered into an agreement, pursuant to which the mother and the father were to have joint legal and physical custody of the child and the maternal grandparents were to have specific visitation rights. The trial court entered an order adopting the agreement. In October 2002, while the child was visiting with the father, the mother overdosed on heroin and was unable to care for the child. As a result, at the urging of the maternal grandparents, the father and the *654 maternal grandparents filed a joint petition to modify custody, seeking to remove shared custody from the mother. The trial court entered a pendente lite order, awarding joint physical custody of the child to the father and the maternal grandparents.
In February 2003, the father filed a petition seeking full custody of the child, claiming that the maternal grandparents had taken the position that their right to the child was superior to his. Following a hearing at which evidence was presented ore tenus,[1] the trial court awarded sole custody of the child to the maternal grandparents, subject to the visitation rights of the father. In denying the father's request for full custody, the trial court, in an order dated December 10, 2003, concluded that the father had voluntarily relinquished custody of the child to the maternal grandparents and that he was unfit to have custody. The trial court made the same findings regarding the mother. The mother, however, does not dispute those findings.
Specifically, the trial court stated in its order:
"Despite the petition of the grandparents requesting that they be granted joint custody with the father, the father requests that he be granted primary custody of the child.[[2]] This court cannot grant such a request due to a record replete with evidence that points to the father's unfitness and voluntary abandonment of this child. As to the father, the record reflects that:
"1. The father was not present at the birth of the child. He claims that he was out of town on business. He did not even tell his mother about the child until the child was 7 months old. He and the mother never lived together. The father chose not to legitimize the child until about a year and five months after the birth of the child, claiming he didn't have the $200.00 to pay for it then. The first time he met the [maternal grandparents], which was when [the child] was around 18 months old, he did not even state his last name.
"2. The father lived at home with his parents till he was twenty-four years old. He moved out to live with a friend, [W.H.] He lived with [W.H.] for three or four months and moved back home. He lived at home for another year and a half then moved in with Mr. [T.] He has been back home for the past year living with his mother. He says he will move out but he doesn't know when  he has made no plans to do so.
"3. The father has a history of quitting jobs after three or four months. He has finally maintained a job with his current employer . . . for a little over two years now, although he is no longer working as a business installer. The father claims to have saved $1,200.00 since February of 2003, but he did not have a plan for his money. Although he requested full custody of his child, he had never thought to budget for [the child]'s clothes or school. When questioned about his monthly expenses, the father stated that he pays his mother *655 $50.00 per month to live in her home, pays for car insurance, his cell phone bill, and for food and gas. He sold his own car and now drives his father's. After going through his expenses and income the father learned that he had over $4,200.00 from February that he could not account for. The father is oblivious at age 30 about where his money goes. The evidence is clear that he has never had to manage his money because his parents loaned [him money] and paid debts for him for years.
"4. Upon cross-examination the father admitted that he had abandoned a former girlfriend when she got pregnant. She later lost the baby. He admitted that he might have abandoned the child, as well. His current girlfriend's name is `Winter.' He could not remember her last name. He met her at her place of employment  a Waffle House [restaurant]. He recently gave up an opportunity to have visitation with [the child] to go out on a date with this girlfriend.
"5. The father had a full month in the summer of 2003 to have visitation with his son. Even with accommodations made with the [maternal grandparents], the father chose not to exercise the visitation, claiming that he had no more vacation days left at work and he did not want to put [the child] in day-care. The evidence further shows that the father never exercises visitation with [the child] alone. Until the last hearing in September, the father has never spent 24 hours alone with his own son.
"6. The father admits that this move will traumatize [the child]. The father also admits that [the child] thinks of the [maternal grandparents] as his parents. The father fully admits that he has waited until now to assert any rights he may have to this child. He admits that his own mother took the active role in issues involving [the child] until February of 2003. The father admits that he has no idea what size clothes [the child] wears because his mother likes to buy the clothes for [the child] and goes with him and picks them out and she knows the sizes. The father admits that he still relies on the [maternal grandparents] to see to [the child]'s medical needs, i.e. taking him to the doctor, etc., because he (the father) `has to work'; despite admitting that he has time to pick up a friend and eat breakfast before work.
"7. Finally, the father agreed in his testimony that [the child] should not be taken out of the [maternal grandparents'] home at this time and placed in his custody. Even . . . the paternal grandmother admitted that the [maternal grandparents] were the ones that made [the child] a top priority, as she noted that she and her son were preoccupied with her husband's terminal illness.
"Based on the above, the court finds by clear and convincing evidence that both parents voluntarily abandoned their parental responsibilities to this child, and as a result [the child] has no true parental bond with either of them. The mother now clearly recognizes this fact[;] the father recognizes that he wasn't there for all those years, but states that he wants to be there now.
"Unfortunately, those years have made all the difference in [the child]'s world because the child's security and bonding to the maternal grandparents took place during the time that the father was not interested in asserting his parental rights. That's the whole point of the emphasis being added by our Supreme Court in its opinion in [Ex parte] Terry, [494 So.2d 628 (Ala.1986)]. *656 That is why there are exceptions to the `Terry' standard.
"This court finds by that same clear and convincing evidence that this father is currently unfit to have custody of any child. Based on the totality of the evidence the father can hardly manage himself, much less the addition of a child. He hasn't a clue where his money goes, his mother continues to dominate most if not all of the aspects of his life, he cannot manage this four-year-old child alone and has succeeded in giving this court not one positive reason to place the child in his custody. The father at age 30 appears extremely immature, concerned with satisfying his own personal needs, easily dominated and influenced by others and incapable of rearing a child without tremendous assistance from others, which would most likely include his mother, with whom he admits to having a very rocky relationship. The court further finds that based on the evidence presented, the child tolerates the paternal grandmother but has been made fearful of her by her loud and threatening exchanges in front of him."
As noted previously, we granted the father's petition for certiorari review to determine whether there was clear and convincing evidence that the father was unfit to have custody or that he had voluntarily relinquished custody of the child to the grandparents.
In reviewing the record in a custody case in which the evidence is presented ore tenus, this Court is not permitted to reweigh the evidence and to substitute its judgment for that of the trial court. Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996). Our review in such a case is limited to whether there was sufficient evidence to support the trial court's findings. We will not disturb the findings of the trial court unless those findings are clearly erroneous. 676 So.2d at 1324. Indeed, as Chief Justice Moore, writing for the Court, stated in another child-custody proceeding:
"When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong . . . ."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases. `In child custody cases especially, the perception of an attentive trial judge is of great importance.' Williams v. Williams, 402 So.2d 1029, 1032 (Ala.Civ.App.1981)."
Ex parte Fann, 810 So.2d 631, 633 (Ala.2001)(emphasis added).
In a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody over the nonparent. Ex parte Terry, 494 So.2d 628 (Ala.1986). This presumption does not apply, however, in a case in which the parent voluntarily forfeits his or her right to custody to a nonparent or where there is a finding of unfitness on the part of the parent. Any finding that the parent is unfit must be based on clear and convincing evidence. 494 So.2d at 633.
We address first whether the father has voluntarily relinquished custody of the child. The child has never resided with *657 the father. In Ex parte D.J., 645 So.2d 303 (Ala.1994), this Court determined that an examination of whether a father of a child born to unmarried parents relinquished his right to custody of the child must begin at the point in time when the father was legally declared by a court to be the father of the child. See also R.K. v. R.J., 843 So.2d 774 (Ala.Civ.App.2002); and R.O.M. v. B.B., 854 So.2d 98, 105 (Ala.Civ.App.2003) (Murdock, J., concurring specially).
The record contains ample evidence to support the trial court's finding that the father had voluntarily relinquished custody of the child to the maternal grandparents. A paternity test conducted two months after the birth of the child established that the father was the child's biological father. Despite this knowledge, the father waited until August 2000 when the child was 16 months old to legitimate the child in the probate court.[3] Therefore, we must determine whether there is sufficient evidence from August 2000, when the father was legally declared by a court to be the father of the child, that he voluntarily relinquished custody of his child.
As the trial court noted, the father "fully admits that he has waited until now to assert any rights he may have to this child." Specifically, the father waited from August 2000 until February 2003 to request custody of his child. During that time, with the exception of a six-month period when the child resided with the mother, the child resided with the maternal grandparents. They reared the child while the father enjoyed the convenience of visitation. During this time, the evidence indicates that the father visited with his son sporadically, that he did not assist in his care, and that he abdicated any and all decisions with regard to the health and welfare of the child to the mother and the maternal grandparents.
Moreover, in September 2000, when the mother gave the maternal grandparents temporary guardianship of the child in the form of a limited power of attorney to make any decisions related to the physical custody, health, education, or maintenance of the child, the father did not seek custody of the child or show any interest or willingness to assist in the daily care of the child. The father admitted that from August 2000 to December 2002 (during the second and third years of the child's life), he wanted the child to live in the home of the maternal grandparents. In October 2002 when the mother overdosed on heroin, the maternal grandparents, concerned for the child's welfare, contacted the father about removing shared custody of the child from the mother. The father, who shared joint legal and physical custody of the child with the mother, did not exercise his prima facie right to custody at that time, but instead sought joint custody with the maternal grandparents and allowed them to continue rearing the child. Indeed, when asked why he had never spent 24 hours alone with his son, the father admitted that he had had the opportunity to but chose not to exercise that opportunity for bonding time with the child. The record reveals the following occurred during cross-examination of the father by counsel for the maternal grandparents:

*658 "[Maternal grandparents' counsel]: And, Mr. [C.], isn't that just a pattern of yours not to take the initiative, but to let [the maternal grandmother] do all of the things necessary for the care of your son, doctor's appointments, preschool, you have done that all of his life, haven't you?
"(No audible answer from witness.)
"[Maternal grandparents' counsel]: And you are still doing it, aren't you?
"[Father]: Yes."
The record is replete with similar examples that provide evidence indicating that the father has forfeited his right to custody of the child, relying upon the maternal grandparents to provide for the child's housing, care, and well-being.
As the Court of Civil Appeals recently stated in K.C. v. D.C., 891 So.2d 346, 349 (Ala.Civ.App.2004), when confronted with a similar situation in which it concluded that the father had voluntarily relinquished his right to custody:
"The grandparents approached the father in 1998, alerted him to facts indicating that the mother was possibly unfit, and told him that the mother had requested that the grandparents rear the child. Under Ex parte Terry, [494 So.2d 628 (Ala.1986),] the father had the superior right to custody, had he chosen to act upon it. Instead, he chose to allow the grandparents to take on the role of parents and to rear the child. The father's actions and statements, as recalled by the grandparents, belie an intent to fulfill his parental role after the mother's choice to abdicate her parental responsibility to the grandparents. Certainly, the father has acted with some degree of responsibility by visiting with the child and by paying some expenses, including day-care expenses and school tuition. However, voluntary relinquishment is not the equivalent of abandonment, and a finding of voluntarily relinquishment need not be supported by evidence that a parent has neglected to visit with or provide for his child."
Based on the foregoing, the trial court did not err in finding that the father had voluntarily relinquished custody of the child to the maternal grandparents and thereby lost his prima facie right to custody.[4] For this reason, the trial court's *659 judgment, awarding custody of the child to the maternal grandparents, is due to be affirmed.
The father also challenges the trial court's finding that he is an unfit parent. Having voluntarily relinquished custody of his child, the father has lost his prima facie right to custody of his child. If at some point in the future the father again seeks custody of the child, he will have to prove that he is a fit parent and he also will have to meet the McLendon standard, that is, he will have to prove that a change in custody would materially promote the child's best interest and, additionally, that the benefits of modifying custody would more than offset the inherently disruptive effect of uprooting the child by such a change of custody. See Ex parte McLendon, 455 So.2d 863 (Ala.1984).
Why does it matter whether the father is declared unfit to have custody at this time since the father has lost his prima facie right to custody of the child by voluntary relinquishment? It matters because a finding of fitness at this time will become the law of the case. Ex parte S.T.S., 806 So.2d 336 (Ala.2001). He would be permitted unjustifiably to wipe his parental slate clean. In the future he will have to show only that he is a fit parent from the time of the most recent custody hearing forward. Ex parte S.T.S., 806 So.2d at 341.
The father argues that the issue of his unfitness as a parent was not pleaded. When one seeks custody of a minor child, *660 fitness as a parent or person fulfilling the parental role is inherently at issue. Indeed, the father injected the issue of "fitness" into the proceedings, when he averred in his motion for custody of the child that "he is a fit parent in every respect and is fully capable of caring for the minor child." Although no witness labeled the father an "unfit parent," there was extensive testimony concerning his suitability to serve as the child's sole custodian. Therefore, the issue of "fitness" was undoubtably litigated.
The issue of parental fitness is not fitness to visit with the child while he or she is in another's custody. The issue of fitness is whether the parent is fit to have the care, custody, and control of, that is, the total responsibility for, the child. See § 12-15-1(17), Ala.Code 1975. Unfitness to have custody at a particular time is not necessarily the equivalent of grounds for termination of parental rights, however. A parent may, after being found unfit, become a fit parent and at that time seek custody of the child.
We now address whether the trial court's finding that the father is an unfit parent is supported by clear and convincing evidence in the record.[5] A review of the record indicates that each factor noted by the trial court as a ground for finding the father is unfit is supported by clear and convincing evidence and that the father admits most, if not all, of those factors. The father, in actuality, does not even argue that he is fit for the responsibility at this time. Moreover, the father's voluntary relinquishment of custody is a primary factor indicating unfitness. The record also reveals that the father ceased paying child support when the child's maternal grandparents were caring for the child. The record further establishes that at the time of the hearing he had drafted a budget, but he had not considered in the budget the expenses of caring for the child; that he refused "for convenience sake" to assume responsibility, other than providing insurance, for the medical needs of the child; and that he had not asked the maternal grandparents whether the child was presently enrolled in preschool. Indeed, the father admitted that in July 2003 the father chose to pick his child up on Saturday, instead of the scheduled Friday night for the weekend visitation because he had a "big date." The foregoing are only a few of the many examples establishing that the father at this time is unfit to assume custody of the child. Clear and convincing evidence established that at this time the father is not ready to assume the care, custody, and control of, that is, the total responsibility for, the child. Because the record supports by clear and convincing evidence the trial court's finding that the father is unfit to have custody of the child at this time, the trial court's judgment, awarding custody of the child to the maternal grandparents is also due to be affirmed on this basis.

*661 "`Neither the Court of Civil Appeals nor this Court is allowed to reweigh the evidence in this case. This case, like all disputed custody cases, turns on the trial court's perception of the evidence. The trial court is in the better position to evaluate the credibility of the witnesses. . . and the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence, and to decide the issue of custody.'"
Ex parte Patronas, 693 So.2d 473, 475 (Ala.1997).
Based on the foregoing, the judgment of the Court of Civil Appeals is affirmed.
AFFIRMED.
NABERS, C.J., concurs.
STUART, SMITH, and BOLIN, JJ., concur specially.
WOODALL, J., concurs in the result.
SEE, LYONS, and HARWOOD, JJ., concur in part and dissent in part.
PARKER, J., dissents.
STUART, Justice (concurring specially).
I am the author of the main opinion, and I wholeheartedly join the special writings of Justice Bolin and Justice Smith. I write specially to express additional views.
Children are a gift from God.[6] They need and deserve the love and support of both their mothers and their fathers. Parents have God-given rights concerning their children, which are and should be protected by state government. With every right we possess, however, comes responsibility. Rights must be claimed and responsibilities assumed or they may be forfeited.
Parental rights require prompt recognition and the discharge of the corresponding responsibility. Young children cannot care for themselves; their needs for protection and care are immediate and continuous. Young children are unique and vulnerable small persons who cannot wait until it is convenient for a parent, male or female, to decide that he or she wants to be entrusted with their care.
Today there is no reason for uncertainty or delay in assuming parental responsibility, as science provides prompt determination of the biological parent of a child and the law offers immediate protection for that parent's rights. Dramatic advances in DNA testing allow putative fathers to determine biological paternity immediately after the child's birth.[7] The Alabama State Legislature in the Alabama Uniform Parentage Act, § 26-17-1 et seq., Ala. Code 1975,[8] and the Putative Father Registry Act, § 26-10C-1 et seq., Ala.Code 1975,[9] has provided methods for a father to assert his rights to and assume prompt responsibility for a child before the child's birth. One objective of these acts is to encourage fathers to step forward and act *662 as fathers. See title to Act No. 84-244, Ala. Acts 1984, which enacted the Alabama Uniform Parentage Act; and title to Act No. 2002-417, Ala. Acts 2002, which amended the Putative Father Registry Act. These acts serve the interests of fathers, mothers, children, and society as a whole.
In Ex parte McLendon, 455 So.2d 863 (Ala.1984), this Court stated:
"A natural parent has a prima facie right to the custody of his or her child. However, this presumption does not apply after a voluntary forfeiture of custody."
455 So.2d at 865. The reasoning behind this holding creating the voluntary-forfeiture-of-custody exception was recently explained:
"The `voluntary forfeiture' exception to a natural parent's prima facie right to custody recognizes that a parent's voluntary forfeiture of his or her child tends to rebut the presumption that the parent in question will best provide the love, care, security, and upbringing the child needs. Concomitantly, it is a reflection of the well-established principle that `ties of affection resulting from years of association between the child and its custodian' are relevant to a determination of the child's best interests. See generally Dale v. Dale, 54 Ala.App. 505, 507, 310 So.2d 225, 227 (Ala.Civ.App. 1975); McGrady v. Brown, 230 Ala. 484, 161 So. 475, 476 (1935)(`"relinquishment of . . . custody to another and continued acquiescence therein are matters to be considered by the court in determining the question of prime importance  the welfare of the child"')(quoting Payne v. Payne, 218 Ala. 330, 331, 118 So. 575, 576 (1928)). As [the Court of Civil Appeals] explained in Borsdorf v. Mills:
"`To tear [a child] from his home and those he knows as his parents and the source of love, safety and security merely to give sanction to a principle of priority of right is unconscionable. The principle of priority of right of parent to custody is founded upon the premise that because of a blood relation and instinct, such parent will better love and care for a child than one not so related. Such premise may be theoretically correct but practical experience has often proved it incorrect. The bonds of love between parent and child are not dependent upon blood relation and instinct, but may be forged as strongly in the crucible of day to day living. Out of the actual relationship of parent and child love grows. It is not merely a product of the biological function of conception and giving birth. To give paramount consideration to the principle of parental priority or ownership in custody decisions would often be an anathema to the best interest of the child.'
"49 Ala.App. 658, 661-62, 275 So.2d 338, 341 (Ala.Civ.App.1973)(quoted in part with approval in Brill v. Johnson, 293 Ala. 435, 437, 304 So.2d 595, 597 (Ala.1974)(Bloodworth, J., concurring specially, and joined by five members of the Court))."
R.K. v. R.J., 843 So.2d 774, 777 (Ala.Civ.App.2002)(footnote omitted).
Parental rights are counterbalanced by the responsibilities parents assume with those rights. See Lehr v. Robertson, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983). The father in this case lost his prima facie right to custody because of his failure to timely assume his responsibilities as a father.
NABERS, C.J., and SMITH and BOLIN, JJ., concur.
*663 SMITH, Justice (concurring specially).
I fully concur in the main opinion. I respectfully disagree, however, with the dissent of Justice Parker and the dissenting portions of the special writings of Justice See and Justice Lyons insofar as they maintain that the trial court's finding of unfitness is not supported by clear and convincing evidence. I further respectfully disagree with Justice Parker's dissent, which also takes issue with the holding of the main opinion that the father voluntarily relinquished custody of the child. I join Justice Stuart's special concurrence and Justice Bolin's special concurrence.
Justice Lyons's dissent concludes that the trial court erred in finding the father unfit, because, the dissent concludes, there is no clear and convincing evidence of misconduct or neglect by the father that would render him an unfit parent. Justice Lyons's dissent also suggests that the trial court's finding of unfitness was "gratuitous" in that the claim of "unfitness" was not specifically pleaded.
The main opinion recites the findings of the trial court. Justice Lyons's dissent contends that the main opinion "emphasizes the totality of various circumstances that pointed to the father's unfitness without giving appropriate emphasis to more recent developments." 924 So.2d at 672. I fully concur with the main opinion because the record in its entirety, with particular emphasis on current facts, warrants a finding that the father, because of his misconduct and neglect, is currently an unfit and improper person to be entrusted with the care and upbringing of the child. The stark facts in this case reveal that by failing to assume legal responsibility for his child, especially when the mother abdicated hers, the father failed to give his young son the parental nurturing a child needs and is entitled to receive from his parents.
Justice Lyons's dissent states that "[a]t most, the evidence suggests that the father is not fully ready to undertake the sole responsibility of parenting." 924 So.2d at 672. His dissent acknowledges that while the father did petition for full custody, he "nevertheless freely and candidly admitted at trial that the child is very happy with the maternal grandparents and that an abrupt change in custody might be traumatic for the child." 924 So.2d at 672. Justice Lyons's dissent asserts that the father should not be faulted for suggesting to the court that a change of custody from the maternal grandparents to him be gradual in nature because a gradual change would be in the child's best interest.
Of course, the father must suggest that any transition of the child into his home should be gradual. His current circumstances explain why he is still not able to assume sole responsibility for his son. He is 30 years of age, and he still has no residence of his own. He currently resides with his mother, although he has a history of moving in and out of her house and has had a "rocky" relationship with her. He "plans" to move out of his mother's house, but he has taken no specific steps to do so. At trial, he testified that he had recently prepared a budget of his living expenses, but he admitted that his budget included no allocation for the child's expenses except what is included in his health plan. Notably, until the trial of this case, the father had never spent 24 hours alone with the child. The father argues that the maternal grandparents limited his contact with his son; thus, he now seeks sole custody. Yet the father admitted at trial that in recent months he contacted the maternal grandparents to advise them that he had a date and, therefore, that he would not pick up his son on Friday as scheduled but would begin his visitation on Saturday instead. His date *664 was with a woman he had just met and whose last name he could not recall at the custody hearing.
Given his behavior and lifestyle choices, it is understandable that the father is willing to allow his child, who is now four years old, to continue residing with the maternal grandparents. He just does not want this Court to hold that he voluntarily relinquished custody or that he is unfit.
As is too often the case, some parents are quite comfortable letting someone else raise their child. It is only when the person or persons actually responsible for the child's life do what persons in those circumstances typically do  make the day-to-day decisions necessary to rearing a child  that these parents assert their parental rights. These parents want control over important decisions, but they want none of the attendant daily parental responsibilities.
Justice Parker speaks of the untenable legal Catch-22 in which the father finds himself. The undisputed facts of this case  as admitted by the father himself  are what they are. The father seeks sole legal custody, yet his actual behavior demonstrates that he has priorities other than the child. The father's legal situation, however, is of his own making.
I find it regrettable that Justice Parker tacitly implies that the main opinion and the special writings are misguided in succumbing to a "statist view." 924 So.2d at 678. Justice Parker's entire conclusion on the relevant legal issue in this case is premised on his conclusion that the trial court impermissibly shifted the burden of proof. I respectfully disagree with that conclusion. As the main opinion notes, the trial court's entire order demonstrates that no burden shifting occurred, and I believe that the trial court's findings are sound, given the facts of this case and the standard of review. Despite Justice Parker's extensive writing on issues of family government, parental rights, and state intrusion on those rights, the facts in this case simply do not support his conclusion that the trial court or this Court subverted the standard of settled caselaw.
As the main opinion correctly notes, the ore tenus rule applies in this case. When evidence in a custody case has been presented ore tenus, the trial court's findings of fact based on that evidence are presumed to be correct. Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). This presumption arises because the trial court is able to observe the demeanor of the witnesses and to evaluate their credibility. Moreover, "the trial court is in the better position to consider all of the evidence, as well as the many inferences that may be drawn from that evidence." 676 So.2d at 1326. Thus, the trial court is in the best position to make a custody determination. 676 So.2d at 1324. Neither this Court nor the Court of Civil Appeals may reweigh the evidence or sit in judgment of disputed evidence presented ore tenus to the trial court in a custody hearing. 676 So.2d at 1324-26.
In Ex parte Terry, 494 So.2d 628 (Ala. 1986), this Court noted that in a custody dispute between a parent and a nonparent, the parent has a prima facie right to custody:
"`The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect *665 to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"
494 So.2d at 632 (citation omitted; quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala. 1983)). Under the law expressed in Ex parte Terry and its progeny, the trial court must determine, in a custody dispute between a parent and a nonparent, whether the parent (1) has voluntarily forfeited custody, and/or (2) is unfit. I do not believe that the trial court errs if it determines, without the issue having been specifically pleaded, that a parent has both voluntarily forfeited custody and is unfit. In fact, we have held that in proceedings involving custody of children this Court "will not be governed by legal niceties in pleading." Evans v. Evans, 264 Ala. 2, 6, 84 So.2d 337, 340 (1955). Given the gravity of a decision to award custody of a child to a nonparent over a parent, the trial court acts with an abundance of caution when it examines both factors instead of only one.
It might be tempting to avoid addressing the issue of fitness here because the father conceded in his testimony that the child is presently better off residing with the maternal grandparents. If the trial court made only a finding of voluntary relinquishment, the child could still be left to reside with the maternal grandparents. Voluntary relinquishment and unfitness, however, are not mutually exclusive findings; I find nothing in Ex parte Terry that would suggest that evidence of a parent's voluntarily abandoning or relinquishing custody of his child cannot be considered in also determining whether the parent is unfit. Indeed, evidence that a parent lacks interest in or fails to care for his or her child would be extremely relevant in determining the parent's fitness.
A parent who is physically present but who fails adequately to supervise, feed, clothe, or otherwise support a child is said to have neglected his or her child. So too, a parent who by lifestyle choices continues to be unavailable to assume parenting responsibilities evidences not only voluntary relinquishment but also neglect by failing to be physically and emotionally present to meet the daily demands of parenting. I believe it is appropriate that this Court address the issue of fitness in this case because the issue of the propriety of the trial court's finding of unfitness is properly raised on appeal.
A reversal of the trial court's determination that the father is unfit would become the "law of the case." The law-of-the-case doctrine holds that "whatever is once established between the same parties in the same case continues to be the law of that case, whether or not correct on general principles, so long as the facts on which the decision was predicated continue to be the facts of the case." Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala.1987). In Ex parte S.T.S., 806 So.2d 336, 341-42 (Ala.2001), this Court applied the law-of-the-case doctrine to a custody determination and held that the Court of Civil Appeals' previous determination of the facts in that case precluded the trial court from revisiting those facts on remand.
The father in this case is either "fit" or "unfit" to be entrusted with the care and upbringing of the child. An unwarranted reversal of the trial court's determination that the father was unfit would foreclose the trial court from subsequently considering whether the father was unfit  at least insofar as it relates to acts that occurred before the reversal and remand  in a later custody proceeding. Thus, the evidence of the father's past actions, including his failure to assume daily parental responsibilities; his inability to manage his own life or to hold steady employment; and the fact *666 that until the trial of this case he had never spent 24 hours alone with his own son, would arguably be barred. Such evidence, unless remote in time, is extremely relevant in a custody determination.
Justice Lyons's dissent states that the trial court's award to the father of specific and liberal unsupervised visitation is an "anomalous result" if the father is truly unfit. I find no inconsistency, however, in the trial court's finding the father to be unfit and yet awarding him liberal visitation. As the main opinion notes, the issue is whether the father is fit to provide for the care, custody, and control of the child, i.e., to take ultimate responsibility for the necessary day-to-day decisions for the child's best interest, not whether he is fit to exercise scheduled visitation. As the main opinion also notes, a finding of unfitness is not tantamount to a termination of parental rights. Said another way, a finding of unfitness is not the equivalent of a finding of permanent parental incompetence.
There is clear and convincing evidence of neglect on the part of the father, which renders him an unfit parent. His voluntary relinquishment of his son's custody is, as already noted in the main opinion, only one of many facts, past and present, that contributed to the trial court's finding of unfitness.
NABERS, C.J., and STUART and BOLIN, JJ., concur.
BOLIN, Justice (concurring specially).
Despite the number of writings, this is not a difficult case. In addition to all five judges on the Court of Civil Appeals, eight of nine Justices on this Court are voting to affirm the judgment of the trial court placing primary custody of the four-year-old child in the hands of the maternal grandparents.
I fully concur with the main opinion that the record supports the trial court's finding that the father had voluntarily relinquished custody of the child to the maternal grandparents and that the record contained clear and convincing evidence that the father was unfit. I also join the special writings of Justice Stuart and Justice Smith. I write specially to address portions of Justice Parker's dissent.
The dissent maintains in part that the evidence does not establish that the father knew of his right to custody. I believe that the record demonstrates that the father was well aware that he had legal rights to this child. In June 1999, two months after the child was born, the father requested a paternity test, which established his paternity. In August 2000, the father filed a declaration of legitimation as to the child in the probate court. In April 2002, he intervened in legal proceedings between the mother and the maternal grandparents regarding the custody of the child. In August 2002, the father entered into an agreement before the court establishing with the mother joint legal and physical custody of the child. In October 2002, the father and the maternal grandparents filed a joint petition to modify custody. It appears from the record that instead of the father's being ignorant of his rights to his own child, he was more aware of his parental legal rights than are most unwed fathers, and he made the conscious decision to forsake his parenting responsibilities, waiting nearly four years to finally request full legal custody.
Much of the dissent, especially as it pertains to the groundwork the Founders of our republic established for our government, is correct and would be well-placed in an opinion that does not deal with the custody of a four-year-old child. I agree with the characterization of the view of our country's Founding Fathers that God, not *667 the state or any government established by man, is the source of all our rights. I strongly contend, however, that this same God also imbued in each of us a sense of responsibility and compassion that should make us recoil from the concept of protecting parental rights to the detriment of a child's safety, well-being, and welfare.
I further agree that parents have a God-given right and responsibility to rear their children and that they should be allowed to do so unfettered by state interference. But this can be true only when a parent accepts that right and responsibility. In this matter, the father not only did not accept his parental duty, he abdicated it.
The father in this case voluntarily let the infant child remain in the care of the maternal grandparents after the mother had left the child. Over the next three years, the father virtually abandoned the child  seeing the child only a few times each year. The father, measured by any standard of parental responsibility, financially abandoned the child. The father has never even spent 24 hours alone with the child and readily admits that a change in custody from the maternal grandparents would traumatize the child. The father also admits that he abandoned a former girlfriend once he found out she was pregnant.
The maternal grandparents filled the void left by both parents' abdication of their parental roles. It was the maternal grandparents who loved, nurtured, fed, clothed, and took care of this child, while the father, at times, placed going out on a date ahead of his precious right to visit with his child. This child was bonding, day by day, with the only people in this world taking care of him while the father was growing up and finding himself.
The dissent quotes several definitions of "government" from Noah Webster's American Dictionary of the English Language (Foundation for American Christian Education 1995) (1828). I find most telling, and most apropos to the facts in this proceeding, the illustration by Webster provided for the fourth definition, concerning the sphere of family government, as set out therein: "`Let family government be like that of our heavenly Father, mild, gentle, and affectionate.'" 924 So.2d at 675. In acknowledging that our Heavenly Father is a loving and affectionate God, I must question where has been the love, gentleness, and affection shown by this earthly father, the appellant in this proceeding, to his child? It is, according to the record, largely nonexistent.
The record reflects that the mother and the father never married. They do not live, and have not lived, together. Since her overdose on heroin, the mother does not seek custody. The father has been irresponsible as a parent for the entire life of the child. Under these circumstances, it was the maternal grandparents who offered the only "family government" support system of which Webster's definition speaks so highly, and which the child in this case so desperately needed.
The very best government for a free society is a limited government. But a "limited government" serves its most noble purpose when called upon to protect those not able to protect themselves  most notably, the children. We should never reach the point where we confuse constitutional philosophy concerning limited government with a court's custodial determination for a child whose parents have failed him. Let us not forget that if the father in this case had appreciated and loved this child since the child's birth, we would not now be entertaining this proceeding.
The dissent goes on to state that "courts should interfere as little as possible with parental decision-making, instead deferring *668 to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act." 924 So.2d at 677-78 (emphasis added; footnote omitted). The only fundamental compromise involved in this matter involves not "parental decision-making," but a fundamental compromise concerning parental duty and responsibility. Unfortunately, the results of such fundamental compromises that we hear about today far too often result in harm to, or the loss of life of, a child. This father voluntarily relinquished his parental rights, and he has proven himself unfit to have custody.
It is all too easy to be heavy on rights and soft on responsibilities. If we are to refer to the "inalienable rights" of the Preamble to the Declaration of Independence, let us also refer to its conclusion: "And for the support of this Declaration, with a firm reliance on the protection of divine Providence, we mutually pledge to each other our Lives, our Fortunes and our sacred Honor." The dissent is devoid of any suggestion that sacrifice, moral or financial responsibility, honor, or even love has any place in deciding whether a parent who has voluntarily relinquished custody of a child is entitled to what the dissent calls an "inalienable right" to primary custody.
With rights come responsibilities, male and female, husband and wife. With parental rights, ordained by God, come parental responsibilities, just as much ordained by God. In fact, we can say that the more sacred the right, the more solemn the responsibility. The defaults of the father to his divinely appointed parental responsibilities throughout his child's life can only be described as egregious.
The Declaration of Independence affirmed a God-ordained natural order. I believe in such a natural order. Nothing in God's order or the Declaration of Independence, however, says that the irresponsible, immature, derelict parent in this case, who has in fact abandoned and ignored his child throughout the child's life, has the essential right to remove the child from the care and custody of its maternal grandparents, who have provided the child with the only love and compassion or semblance of hearth and home the child has ever known.
The learned trial judge heard the evidence and observed the demeanor of the witnesses. The trial judge was on the firing line and showed a proper concern for the custodial needs of the child in this proceeding, a child who was bereft of parental care, parental protection, and parental nurturing. "The trial court is in the best position to make a factual determination  it hears the evidence and observes the witnesses." Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994). The trial court's opinion is supported by the record; it is not plainly and palpably in error; and the evidence of the father's fitness should not be reweighed.
"`[O]ur standard of review is very limited in cases where the evidence is presented ore tenus. A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, Payne v. Payne, 550 So.2d 440 (Ala.Civ.App.1989), and Vail v. Vail, 532 So.2d 639 (Ala.Civ.App. 1988), and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong, or unless an abuse of the trial court's discretion is shown. To substitute our judgment for that of the trial court would be to reweigh the evidence. This Alabama law does not allow. Gamble v. Gamble, 562 So.2d 1343 (Ala.Civ. App.1990); Flowers v. Flowers, 479 So.2d 1257 (Ala.Civ.App.1985).'"
*669 Perkins, 646 So.2d at 47 (quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ. App.1993)).
While Justice Parker correctly notes that parents generally know what is best for their children and act accordingly, we are not here dealing with generalities. Generalities are easy. What is not easy is the trial court's duty to deal with the horrible circumstances of the real life upbringing of an innocent, unfortunate child who has been abandoned because of the drug addiction and gross dereliction of his parents  a regrettable and all-too-common occurrence in the courts of Alabama.
The problem in this case lies with the child's mother and father, not the decision of the trial court. By awarding primary custody to the maternal grandparents, the trial court has refused to sanction the father's violation of his parental responsibilities in abandoning his proper role as father of this child.
Reversing the trial court's judgment and awarding primary custody to the father as the dissent urges would create an immediate and grave risk of tearing the child from the only loving family he has ever known and placing this tender-aged child in the hands of a parent who was found unfit for that role by an expert trial judge who has seen the parties, listened to the testimony, and gained a much deeper knowledge of the facts and circumstances of this case than an appellate court can ever have. It would quite simply be wrong.
NABERS, C.J., and STUART and SMITH, JJ., concur.
SEE, Justice (concurring in part and dissenting in part).
I concur that G.C., Jr. ("the father"), relinquished his right to the custody of his son, J.G.C. ("the child"). From August 2000, when the father legitimated the child, until February 2003, when the father first sought sole physical custody of the child  with the exception of a six-month period when the child resided with his mother  the child lived with his maternal grandparents. In August 2002, the father, the mother, and the maternal grandparents negotiated an agreement pursuant to which the father shared joint physical custody with the mother and the maternal grandparents were granted visitation rights. The trial court entered an order incorporating that agreement. The father allowed the child to continue to reside with the maternal grandparents. Even when the father's joint custodian, the mother, overdosed on heroin in October 2002, the father did not assert his right to physical custody of the child; he continued to allow him to reside with the child's maternal grandparents. Thus, the father voluntarily allowed the child to come to know the home of his maternal grandparents as his home and to come to know his maternal grandparents as the adults on whom he depended. The evidence, which is more fully elaborated in the main opinion, is sufficient to support the trial court's finding that the father voluntarily relinquished his right to the physical custody of the child.
I dissent, however, from the main opinion insofar as it affirms the holding of the trial court that the father is unfit. First, I disagree with the main opinion's assertion that it was necessary for the trial court to reach the issue of the father's fitness. The main opinion asserts that the father injected the issue of "fitness" into the proceedings when he averred in his motion for custody of the child that "`he is a fit parent in every respect and is fully capable of caring for the minor child.'" 924 So.2d at 660. However, the father did not have the burden of proving his fitness in order to be awarded sole custody of the child; he *670 enjoyed the presumption of a natural parent's right to custody. Ex parte Terry, 494 So.2d 628 (Ala.1986). The burden was on the maternal grandparents to prove that the father was unfit or that he had voluntarily relinquished custody of the child. The maternal grandparents argued only voluntary relinquishment; they did not assert that the father was an unfit parent.
The main opinion says that it was necessary for the trial court to address the issue of the father's fitness, for the following reason:
"Why does it matter whether the father is declared unfit to have custody at this time since the father has lost this prima facie right to custody of the child by voluntary abandonment? It matters because a finding of fitness at this time will become the law of the case. Ex parte S.T.S., 806 So.2d 336 (Ala.2001). He would be permitted unjustifiably to wipe his parental slate clean. In the future he will have to show only that he is a fit parent from the time of the most recent custody hearing forward."
However, I do not suggest that the father be declared a "fit parent." I suggest only that he should not have been declared an unfit parent because the maternal grandparents did not raise that issue.[10] Therefore, if this Court were to reverse the trial court's holding of unfitness, we would not need to be concerned that we had "wipe[d] [the] parental slate clean."
Moreover, the suggestion that, if the father is not declared unfit, "[i]n the future he will have to show only that he is a fit parent from the time of the most recent custody hearing forward," presents a problem that does not in fact exist. At the time of the hypothesized future petition for a change in custody, the father will have to meet the McLendon standard  that a change in custody would materially promote the child's best interest and that the benefits of modifying custody would more than offset the inherently disruptive effect of uprooting the child by a change of custody. See Ex parte McLendon, 455 So.2d 863 (Ala.1984). In addition to meeting that burden, however, he will be required to prove that he "is fit," 455 So.2d at 866, that is, he will have to prove his fitness at that time, not at some time in the past.[11]
I dissent also from the main opinion's statement without citation to authority that "the father's voluntary relinquishment of custody is a primary factor indicating unfitness." 924 So.2d at 660. In Ex parte Terry, this Court established the standard for a trial court to apply in a custody dispute between a parent and a nonparent. Ex parte Terry does not support the proposition that voluntary relinquishment is a factor in the determination of unfitness:
"`The prima facie right of a natural parent to the custody of his or her child, as against the right of custody in a nonparent, is grounded in the common *671 law concept that the primary parental right of custody is in the best interest and welfare of the child as a matter of law. So strong is this presumption, absent a showing of voluntary forfeiture of that right, that it can be overcome only by a finding, supported by competent evidence, that the parent seeking custody is guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'"
Ex parte Terry, 494 So.2d at 632 (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala. 1983)). According to Ex parte Terry, "absent a showing of voluntary forfeiture," the parental presumption may be overcome only by a sufficient showing of misconduct or neglect rendering the parent unfit. Relinquishment and unfitness are alternative bases for depriving a parent of custody.
Moreover, a finding that a parent is unfit must be based on clear and convincing evidence. Ex parte Terry, 494 So.2d 628. It is far from obvious to me that a parent's considered judgment that at some point in time it is better for the child to be cared for by a grandparent indicates that the parent is, clearly and convincingly, "`guilty of such misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question.'" 494 So.2d at 632.
Finally, for the reasons stated in Justice Lyons's dissent, I do not believe that the maternal grandparents have proven the father's unfitness by clear and convincing evidence. See Ex parte Terry, 494 So.2d 628.[12]
I therefore concur in the main opinion insofar as it holds that the father relinquished his right to the custody of his son; I dissent, however, from the main opinion insofar as, by affirming the judgment of the Court of Civil Appeals, it affirms the trial court's holding that the father is unfit.
LYONS, Justice (concurring in part and dissenting in part).
I concur in the majority's decision to affirm the judgment of the Court of Civil Appeals, which affirms the judgment of the trial court, based on evidence that the father voluntarily relinquished custody of the child to the maternal grandparents. This Court will affirm a judgment that is supported by any valid legal ground. Ex parte CTB, Inc., 782 So.2d 188 (Ala.2000). However, I respectfully dissent from the decision to affirm the trial court's ex mero motu order insofar as it deems the father an unfit parent.
The record is replete with evidence suggesting a healthy and cooperative relationship between the father and the maternal grandparents before the trial. As early as August 2002, the mother and the father shared joint legal custody of the child. After the mother overdosed on drugs, the father and maternal grandparents agreed to seek joint custody of the child, and the trial court entered a pendent lite order to this effect. Before trial, the father sought full custody. After hearing the evidence, not only did the trial court deny the father full custody, without being requested to do so by the maternal grandparents or the child's guardian ad litem it deemed the father unfit.
*672 The trial court's order, upon which the main opinion relies, emphasizes the totality of various circumstances that pointed to the father's unfitness without giving appropriate emphasis to more recent developments. Those circumstances include the father's past history of drug and alcohol addiction, his poor work history, and his carelessness regarding his finances. It further characterizes the father as immature, irresponsible, and easily dominated by his mother. Specifically, the order states that the father was not present when the child was born; that he did not legitimize the child until the child was approximately 16 months old; that he failed to exercise his regularly scheduled visitation rights during a particular summer month because he lacked vacation days at this job; that before September 2003 he never spent 24 hours alone with the child; that he lived with his mother at the time of trial; and that he was easily dominated by his mother.
I disagree with the main opinion that these characterizations by the trial court, many of which, as previously noted, ignore more recent and positive events, rise to a level of unfitness. The record is replete with evidence demonstrating that the father has made great strides in reforming his life and in establishing a loving relationship with the child. The father sought professional rehabilitation for his addictions in 1997; he has been sober since October 1998, before the child was born; he continues to attend meetings of Narcotics Anonymous and Alcoholics Anonymous; and he has maintained a steady job for the past two years. Additionally, the father established contact with the child shortly after the child's birth; he subsequently legitimized the child; he intervened in and was part of the legal proceedings between the mother and the maternal grandparents regarding the child; as early as August 2002, he and the child's mother shared joint legal custody of the child; he cooperated with the maternal grandparents in seeking to modify the custody arrangement he held with the child's mother after her drug overdose; before trial, he and the maternal grandparents shared joint custody of the child; he has maintained constant contact with the child; he pays for the child's health insurance and various other expenses, notwithstanding the trial court's criticism of his management of his finances; and he has attended and completed parenting classes. Indeed, under the trial court's order, the father was awarded very specific and liberal unsupervised visitation with the child, certainly an anomalous result if he is so unfit.
At most, the evidence suggests that the father is not fully ready to undertake the sole responsibility of parenting. While the father did file a petition seeking full custody, he nevertheless freely and candidly admitted at trial that the child is very happy with the maternal grandparents and that an abrupt change in custody might be traumatic for the child. The father, in essence, suggested to the court that he favored a change more gradual in nature. Certainly the father cannot be faulted for respecting the best interests of the child.
In Ex parte Terry, 494 So.2d 628, 632 (Ala.1986), this Court stated that in order for a nonparent to overcome a natural parent's right to the custody of his child, there must be a finding of "`misconduct or neglect to a degree which renders that parent an unfit and improper person to be entrusted with the care and upbringing of the child in question'" (quoting Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983)(emphasis omitted)).
In Horn v. Horn, 879 So.2d 1197 (Ala. Civ.App.2003), the trial court, upon finding the mother unfit, awarded custody of her five children to the maternal grandparents. *673 The Court of Civil Appeals reversed the trial court's judgment, stating:
"The evidence produced at the trial indicated that the mother was struggling financially, that she had no driver's license and no vehicle, that some of her children have special needs, and that the children have some unspecified dental problems that have resulted in their having some teeth removed....
"We do not find clear and convincing evidence of the mother's unfitness in this record. At most, we find evidence that the grandparents, because of their intact marriage, their stable and greater income, and their experience as parents, are perhaps more fit than the mother. . . . This mother is employed, she rents a home, and she has friends upon whom she can rely for assistance. She sought treatment for depression on her own initiative, and she stated at trial that she would seek assistance again, through counseling or other methods, were she to become depressed or overwhelmed by her situation. The trial court commended the mother for the steps she had taken to improve her life. We do so as well. However, in our opinion, the improvements the mother has made serve to indicate her fitness not her unfitness."
879 So.2d at 1202-03 (emphasis added).
In H.K. v. G.S.F., 877 So.2d 611 (Ala. Civ.App.2003), the Court of Civil Appeals held that the trial court had erred in awarding joint physical and legal custody to the mother and the paternal grandmother absent a specific finding of unfitness on the part of the mother:
"The record supports the trial court's findings that the mother had lived in and had been evicted from several residences, had a poor work history, had remained in an abusive relationship with her husband for an extended period, and had only a `marginal home.' However, despite those problems, the record further reflects that the mother had otherwise properly cared for the child; had maintained stable housing for approximately one year before the hearing; had separated from her husband in October 2000 and had subsequently filed for a divorce; and had also obtained stable employment, working as a cashier and as a housekeeper. The mother pays for day care for the minor child and for another child of hers. She has also attended parenting classes since approximately July 2002. The trial court, without having found the mother to be unfit, awarded the grandmother joint physical and legal custody of the child. The record does not reflect that a prior custody judgment divested the mother of custody of the child or that the mother relinquished custody of the child. Therefore, we must conclude that the trial court erred in granting the paternal grandmother joint physical and legal custody."
877 So.2d at 612-13.
After comparing the facts in the above-stated cases to the facts in this case, I find no clear and convincing evidence of misconduct or neglect by the father that would render him an unfit parent. If this parent is unfit on the grounds here cited, in disregard of the undisputed evidence of rehabilitation from the past mistake of drug abuse, then the authority of the courts to declare parents unfit has been dramatically expanded, and parents across this state stand in jeopardy of being declared unfit for matters such as financial irresponsibility and dependence on a parent, a substantially attenuated degree of fault inconsistent with the standard that has heretofore been applied.
The main opinion poses the question "[w]hy does it matter whether the father is declared unfit to have custody at this time *674 since the father has lost his prima facie right to custody of the child by voluntary relinquishment?" 924 So.2d at 659. It matters because the trial court's gratuitous finding of unfitness, in the absence of clear and convincing evidence, will become the law of this case and will have an unwarranted detrimental effect on any future attempt by the father to gain custody of the child. See Ex parte S.T.S., 806 So.2d 336 (Ala.2001). In other words, in a future modification proceeding, the father will have the unjustifiable burden of removing from his parental slate a previous determination of unfitness that was not supported by clear and convincing evidence. See Ex parte McLendon, 455 So.2d 863 (Ala.1984). The trial court's gratuitous finding of the father's unfitness, in a proceeding where no allegation in any pleading charged him with unfitness, where no witnesses testified that he was unfit, and where the guardian ad litem opined that there was no evidence to indicate he was unfit, should not stand.
SEE and HARWOOD, JJ., concur.
PARKER, Justice (dissenting).
Six of the nine Justices of this Court have written seven opinions in this case.[13] I find this remarkable, because neither the applicable child-custody laws nor the relevant legal precedents appear to be particularly unclear or inconsistent. This being so, we must look elsewhere for an explanation. After considerable reflection, I have concluded that the primary cause of the Court's varied and often conflicting opinions in this case is disagreement over foundational issues that underlie the more visible custody issues. Thus I believe it is imperative to consider those foundational issues to properly resolve the case.
Some of these underlying issues include: What are the distinct jurisdictional authorities of the state vis-à-vis the family, and, thus, to what extent may the state be involved in a custody dispute? What standard of review should apply when the lower court disregards higher court standards and precedents? What is this Court's proper response to a standard that appears to result in injustice? And by whom are the best interests of a child to be determined?
I write separately to consider these fundamental issues. I also write to show that under Alabama law the father did not voluntarily relinquish his right to sole custody of his son because he waited four months after his first opportunity to assert his right. And I join Justice Lyons in that portion of his writing dissenting from the finding that the father was unfit, which finding, I note, only a minority of this Court has chosen explicitly to uphold.

I.

Courts must recognize that the state is but one of several spheres of government, each with its distinct jurisdiction and limited authority granted by God.
Perhaps the first fundamental issue that should be considered in this case is the meaning of "government," and the nature of its multiple jurisdictions as recognized by our nation's Founders. This is because our understanding of government in general will largely determine our views of particular governments and their interactions, such as the extent of permissible state government involvement in family government matters, including child-custody disputes.
*675 America's Founding Fathers understood the word "government" to possess a broader meaning than we usually acknowledge today, as seen clearly in Noah Webster's original American Dictionary of the English Language, the definitive guide to English usage in the early American republic. Webster's first definition of "government" is "[d]irection; regulation," which he illustrates in terms of individual government: "These precepts will serve for the government of our conduct." Webster also illustrates his second definition, "[c]ontrol; restraint," in terms of individual government: "Men are apt to neglect the government of their temper and passions." Webster's third definition, "[t]he exercise of authority; direction and restraint exercised over the actions of men in communities, societies, or states," is the broadest definition of government and applies to every sphere. Noah Webster, An American Dictionary of the English Language (Foundation for American Christian Education 1995) (1828).
Webster introduces a second government sphere, the family (or the household), with his fourth definition of government, "[t]he exercise of authority by a parent or householder," which he illustrates with the following quote from Shepard Kollock: "Let family government be like that of our heavenly Father, mild, gentle, and affectionate." It is only with Webster's fifth definition of government, "[t]he system of polity in a state," that he identifies the government sphere most recognized today  state (or civil) government. Lastly, Webster also recognizes the governing sphere of the church, which he defines in one entry as those "united under one form of ecclesiastical government." Id.
Webster's definitions demonstrate that our Founders thought in terms of a plurality of governments  including individual government and the covenantal governments of the family, the state, and the church  and not of state government alone. Each of these governments possesses its own exclusive jurisdiction of authority, constituting the original "separation of powers." Thus the separation of powers among the spheres of governments is of a higher order and greater significance than the separation of powers within a particular sphere of government, as in the state government's division into executive, legislative, and judicial branches. Consequently, courts must recognize and uphold the separation of powers among the various government spheres even more diligently than they already recognize and uphold the separation of powers within the state sphere of government.[14]
*676 Having acknowledged the historic meaning of government generally as well as having recognized the existence of the four particular government spheres, we should next consider how these governments relate to each other. Perhaps their most fundamental connection is that they all possess grants of specific and limited jurisdiction from the ultimate source of all legitimate authority, God (see Romans 13:1-2 ("there is no authority except from God, and those that exist have been instituted by God")), who as the Supreme Judge of the World is the final authority over all disputes among men as well as among all governments of men. (See Declaration of Independence.)
Another way in which these governments relate is that, although each sphere possesses a distinct and exclusive jurisdiction, the governments are not independent of each other but are interdependent. One way in which these governments are interdependent is through a hierarchy that reflects the order of their creation. Thus, individual government historically preexists family government. Moreover, because individuals make up families and because individual self-government is necessary for family government to exist and to function properly, individual government supports family government while retaining its own exclusive sphere of authority. Likewise, family government preexists and supports state government, while retaining its own exclusive sphere of authority. If parents do not train their children to respect authority at home, for example, they are less likely to respect authority in government outside the home. Similarly, church government is also composed of individuals and families that preexist and retain their own distinct governing authorities while recognizing and supporting the separate authority of church government.
Besides this mutually supportive role, the governments also provide a mutually corrective role. Thus, when individuals break covenant in one sphere of government, authorities in other spheres can take corrective action. If a parent exceeds the jurisdictional boundaries of family government  for example, by sexually abusing a child  state government may sanction the parent for child abuse in a temporal court of justice and, if the parent is a member of a local church, the government of that church may sanction the parent in a spiritual court. These mutually corrective jurisdictions may be understood as "checks and balances" among the governments, which doctrine, like that of the "separation of powers," is of divine creation rather than human invention.
Our legal traditions have long recognized these distinct government spheres, their interrelations, and their separate jurisdictions, although not always using such terms. Thus, what we call "individual rights" may also be understood as the right of individuals to govern themselves. Likewise, what we call "parental rights" are the rights of parents to govern their children, which from ancient times were symbolized by the authority of the rod of corporal punishment. (See, e.g., Proverbs 13:24 ("He who spares the rod hates his son, but he who loves him is diligent to discipline him.").) Similarly, the courts' recognition of "religious rights" includes deference to the decisions of ecclesiastical authorities (see historical overview in Yates v. El Bethel Primitive Baptist Church, 847 So.2d 331 (Ala.2002) (Moore, *677 C.J., dissenting)).[15] This sphere of church government has been symbolized by the keys of the kingdom. (See Matthew 16:19 ("I will give you the keys of the kingdom of heaven, and whatever you bind on earth shall be bound in heaven, and whatever you loose on earth shall be loosed in heaven.").) State government also has its distinct sphere of authority or governing rights and ancient symbol, the sword of justice. (See Romans 13:4 ("[The ruler] is God's servant for your good. But if you do wrong, be afraid, for he does not bear the sword in vain....").)[16]
To be sure, at different times in human history and in different places today, each of these legitimate government spheres has improperly exceeded its own lawful authority or even usurped the authority of another government. For example, during the French revolution, individual government exceeded its jurisdiction by executing vigilante "justice" on aristocrats who declined to placate the mob.[17] Likewise, whenever parents abuse or kill their children, such as the infanticide sanctioned by pagan Rome or the abortion sanctioned by shifting majorities of the United States Supreme Court, family government exceeds its authority. Similarly, during periods in European history, church government exceeded its proper jurisdiction and intruded into areas reserved for state government.
In modern times, however, the governing jurisdiction that most often exceeds its proper authority by usurpation is not the individual, the family, or the church, but the state. Because we live in an age in which such usurpation is so widespread that it has come to be commonly tolerated, this Court, as an organ of the state and, simultaneously, a minister of justice for all, must be especially vigilant to resist such usurpation in whatever guise it presents itself, even where it appears to favor the interests of a particular child.

II.

Because God, not the state, has granted parents the authority and responsibility to govern their children, parents should be able to do so unfettered by state interference.
In view of the above, each time a court considers a child-custody dispute it should begin by taking judicial notice of the fact that parents possess the right and responsibility to govern and raise their children; that God, not the state, has given parents these rights and responsibilities, and, consequently, that courts should interfere as little as possible with parental decision-making, *678 instead deferring to parental authority whenever it has not been fundamentally compromised by substantial neglect, wrongdoing, or criminal act.[18]
Explicit judicial acknowledgment of the source of parental rights is vital to preserve the vision and the reality of the state and society our Forefathers fought and died for, because many leaders in our society today reject the Founders' view. They regard as anathema all calls to acknowledge God as the source of our rights and instead look to the state for "conferred" rights. But this statist view cannot be correct, for it converts our "rights" into mere privileges that endure only as long as supporters of these privileges maintain sufficient power in government. After all, if the state possesses the authority to grant our "rights" it has the authority to take them away.
A recent ruling from the West Virginia Supreme Court of Appeals illustrates the consequences of converting God-given rights into state-granted privileges and thus underscores the importance of judicial acknowledgment of, and deference to, the true source of our rights. In Clifford K. v. Paul S., 217 W.Va. 625, 619 S.E.2d 138 (2005), West Virginia's highest Court held that custody of a child should be awarded to a lesbian "partner" of a child's deceased mother rather than to the child's natural grandparents, because the lesbian was the child's "psychological parent" and the child's "second mother, by design" and "in actuality." 217 W.Va. at 631, 619 S.E.2d at 158-59.
Several erroneous presuppositions underlie the West Virginia ruling. One is the presupposition that parental rights are mere licenses from the state, which may act through its judicial agent to alter or abolish them as it sees fit. Another erroneous presupposition is that the parental roles of father and mother are interchangeable, functional, and subjective rather than distinct, covenantal, and objective. Under this view, children need "caregivers" rather than a father and a mother; consequently, whoever gives the care is the "real parent." Thus, one mother or two, one father or none, or a whole village  it matters not as long as the child receives "care." These views of parenthood and parental rights are fundamentally incompatible with our Founders' belief that inalienable rights, including parental rights, are given by God, who as the Creator determines their nature and limits.
Concerned that a trend of increasing state usurpation of family jurisdiction typified by the West Virginia ruling threatens Alabama parents as well, I welcome Justice Bolin's "agree[ment]" in his special concurrence "that parents have a God-given right and responsibility to rear their children ... unfettered by state interference," 924 So.2d at 667, and other Justices' joining this judicial acknowledgment of the true source of parental authority and responsibility. Nevertheless, I remain troubled that more of my colleagues have not joined this explicit acknowledgment and that it is not matched in this case by action to repudiate the lower court's extrajurisdictional order.
To be sure, I recognize that even the most duly deferential court cannot completely avoid all state involvement in parental matters other than in the exceptions I stated above: cases of criminal behavior, substantial neglect, or other wrongdoing by parents. Yet where courts cannot avoid other involvement  such as custody *679 disputes unwed natural parents have brought to them  courts should rule as narrowly as possible so as to intrude as little as possible. And where a custody dispute is between a natural or biological parent and one who is not a parent, courts should strongly favor the natural parent.
The fundamental principles outlined above have been recognized by Alabama courts. Alabama appellate precedents do acknowledge that the right to parent one's child is "a fundamental right," K.W. v. J.G., 856 So.2d 859, 874 (Ala.Civ.App.2003), "ordained" by "a higher authority." Ex parte Sullivan, 407 So.2d 559, 563 (Ala. 1981). Because our Creator established the parent-child relationship, "a fallible judge should disturb the relationship thus established only where circumstances compel...." 407 So.2d at 563-64. Thus, parental rights may be terminated only in the "most egregious of circumstances." Ex parte Beasley, 564 So.2d 950, 952 (Ala. 1990). Because the right to custody of one's child is a parental right, Alabama law recognizes the natural parent's "prima facie right to custody" over nonparents as "grounded in the common law concept that this primary parental right ... is in the best interest ... of the child as a matter of law." Ex parte Mathews, 428 So.2d 58, 59 (Ala.1983). Consequently, a natural parent's prima facie right to custody may be defeated only when the natural parent is found unfit by clear and convincing evidence or where he or she acts to voluntarily relinquish this right to custody. Ex parte Terry, 494 So.2d 628, 630 (Ala.1986).

III.

To strip the father of custody of his child, the trial court improperly alters the standards this Court set out in Ex parte Terry.
Perhaps because the applicable law and precedent so clearly require courts to minimize their involvement in matters of family government and parental authority, the trial court in the instant case does formally acknowledge the principle of the father's prima facie right to custody, as stated in Ex parte Terry. But the trial court undermines this acknowledgment in practice by impermissibly altering the Ex parte Terry standard to strip the father of his right.
On the issue of fitness, for example, rather than meet the burden of proof of showing by clear and convincing evidence the father's lack of fitness at the time of its ruling, the trial court's order reveals an impermissible shift of the burden of proof to the father to prove that he is fit to have custody: "[The father] has succeeded in giving this court not one positive reason to place the child in his custody." (Emphasis in original.) The lower court's treatment of the father as unfit until proven fit is analogous to a court's changing the governing standard in a criminal case to "guilty until proven innocent."[19]
Similarly, the trial court's treatment of "voluntary relinquishment of custody" also *680 involves an improper alteration of this Court's standard to justify stripping the father of his right to custody. Although the trial court's order initially cites the correct standard of voluntary relinquishment of custody, it invents a different standard when it finds "that both parents voluntarily abandoned their parental responsibilities." (Emphasis added.)
To be sure, custody is a parental responsibility. But it is only one among many, and a parent conceivably could voluntarily abandon a dozen parental responsibilities, yet not voluntarily abandon the one parental responsibility  custody  that is specified by the Ex parte Terry standard at issue before us. That the trial court failed to find the requisite abandonment of custody is telling; that the court still stripped the father of his parental rights may be treated as conclusive proof of its judicial overreach.
I do not doubt that the trial court was sincerely motivated by what it regarded as the "best interest of the child" when it ordered the removal of the father's right to custody. The best intentions, however, do not grant a lower court authority to alter the lawful judicial standards of this state. The best intentions also do not permit a lower court to employ those altered standards to strip the father of all custody rights when no party to the case so requested. That is because, absent such a request, the father has not received notice of the potential loss of all of his custody rights, and he has not had the opportunity to defend himself in court from that prospect.
Even the child's maternal grandparents, who opposed the father's petition for sole custody (and thus had every incentive to support a judicially imposed reduction or removal of the father's rights), declined to petition the trial court to strip the father of all custody rights. The maternal grand-parents recognized that the child's interests would be served best by having his father at least continue to share custody. Because the grandparents recognized this despite their personal conflicts of interest, the trial judge should have deferred to their superior knowledge of the family circumstances, just as appellate courts ordinarily accord trial courts a presumption of correctness based on their relatively superior experience with a case.

IV.

By disregarding the proper legal standards, the lower court has effectively waived the presumption of correctness in this Court's review of its decision.
As Justice Stuart stresses in the main opinion and Justice Bolin and Justice Smith reiterate in their special concurrences, in a child-custody case in which evidence is presented ore tenus, this Court ordinarily may not reweigh the evidence or substitute its judgment for that of the trial court. See Ex parte Bryowsky, 676 So.2d 1322 (Ala.1996). Instead, as I noted above, the trial court is accorded a "presumption of correctness on appeal," Ex parte Perkins, 646 So.2d 46, 47 (Ala.1994), due, in the words of Chief Justice Moore, to "the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility." Ex parte Fann, 810 So.2d 631, 633 (Ala.2001).
Although I agree with my colleagues in their summary of the law to this extent, I believe their recitation to be incomplete because it omits reference to the circumstance by which the lower court forfeits any presumption of correctness. As Justice Stuart wrote earlier this year, "The ore tenus rule does not ... cloak with a presumption of correctness a trial judge's conclusions of law or the incorrect application of law to the facts." Waltman v. *681 Rowell, 913 So.2d 1083, 1086 (Ala.2005) (citing Griggs v. Driftwood Landing, Inc., 620 So.2d 582, 586 (Ala.1993)). See, also, Ex parte Board of Zoning Adjustment of Mobile, 636 So.2d 415, 418 (Ala.1994) ("When a trial court improperly applies the law to the facts, the presumption of correctness otherwise applicable to the trial court's judgment has no effect."). Instead, this Court's review of conclusions of the law and the application of the law to the facts is de novo. Allstate Ins. Co. v. Skelton, 675 So.2d 377, 379 (Ala.1996).
In the instant case, because the lower court impermissibly altered the standards established by this Court to reach the extrajurisdictional outcome it desired, it has arrived at incorrect conclusions of law and has improperly applied the law to the facts. It has, thereby, waived its right to a presumption of correctness upon this Court's review.

V.

Absent knowledge of a right to custody and intentional surrender of that right, there is no "voluntary relinquishment" of custody under Alabama law.
While mistakenly cloaking the trial court's order in the instant case with a presumption of correctness, the main opinion upholds the trial court's erroneous findings of voluntary relinquishment as sufficient justification to strip the father of his right to custody. Yet, reviewed de novo, the father's acts clearly do not constitute "voluntary relinquishment of custody" under Alabama law.
In Alabama, an act of "voluntary relinquishment is ... essentially synonymous with the concept of `waiver,' which [is] defined as the `voluntary and intentional surrender ... of a known right.'" Ex parte D.J., 645 So.2d 303, 306 (Ala.1994) (quoting Dominex, Inc. v. Key, 456 So.2d 1047, 1058 (Ala.1984)). "By definition ... a party `cannot waive a right of which he is unaware.'" Ex parte D.J., 645 So.2d at 306 (quoting Webb v. State, 539 So.2d 343, 353 (Ala.Crim.App.1987)). Thus, in Alabama, for a parent to voluntarily relinquish custody of his or her child, the parent: (1) must know he or she has a right to custody and (2) must voluntarily and intentionally act to give up that right of custody.
The main opinion fails to establish either of these two requirements, let alone both of them, to justify its claim that the record "contains ample evidence" to support the trial court's finding that the father voluntarily relinquished custody of his son to the maternal grandparents.

VI.

The record contains ample evidence indicating that the unwed father did not know that he had a right to sole custody of his child.

The main opinion fails to show that the unwed father knew that he had the right to sole custody of his son at the time the main opinion claims he should have petitioned for it. In fact, the only evidence the main opinion supplies on this issue is evidence of the father's lack of knowledge of his prima facie right to sole custody.
Quoting from the trial court's ruling, the main opinion shows that the father lacked awareness of his rights as late as the start of the instant action: "[T]he father `fully admits he has waited until now to assert any rights he may have to this child.'" 924 So.2d at 655 (emphasis added). The record elsewhere supplies further evidence indicating that the father lacked awareness of his own custody rights. When asked why he did not take steps to obtain sole custody of his son at one point when the mother left the child for a time with the *682 maternal grandparents, the father replied, "I didn't know what my rights were...."[20]
At first blush, it may seem peculiar that a father would doubt his right to sole custody of his own infant child. But that is not so peculiar in a world in which courts have granted women the legal "right" to terminate the life of their pre-born children without even notifying the fathers, let alone obtaining their consent. See Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), and Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).
These cases and their progeny are destructive of unity and mutuality in marriage because they ultimately stand for the doctrine that mothers' rights trump fathers' rights in marriage. And, if mothers' rights are to be considered superior to fathers' rights even when the parents of the child are married, how much more so when the parents are not wed? In such a context, it is quite understandable for the unwed father in the instant case to be unaware that he has any right to sole custody over an illegitimate child.
Whether one considers the father's confessed ignorance of his parental rights to be reasonable, however, is beside the point, for reasonable ignorance is not the standard. Actual ignorance is the standard, and the record shows that the unwed father was in fact unaware that he possessed any right to sole custody of his son. Consequently, under the controlling Ex parte D.J. standard, requiring "voluntary and intentional surrender" of a known right, and contrary to the main opinion, the father in this case could not have "waiv[ed] [the prima facie] right [to sole custody] of which he was unaware."[21]

*683 VII.

The record contains ample evidence indicating that the father did not voluntarily and intentionally surrender his custody rights.

The record also supplies ample evidence indicating that the father did not act to "voluntarily and intentionally surrender" his right to custody. Instead, he increasingly asserted his custody rights over time so that, by the start of the proceedings in the instant case, he was petitioning the court for sole custody.
The father's increased assertion of his rights over time occurred even though the mother initially avoided involving the father in the child's life. She did not at first inform him of her pregnancy, and she did not tell him of the birth until after the delivery. Nonetheless, and although the father lived and worked out of state at the time, he did take the initiative to test for paternity and to petition the court to officially recognize him as the father. The court did so and gave the child his father's family name.[22]
The first time a question of custody arose in this case was in February 2002, when the child was two years old. Unbeknownst to the father, the maternal grandparents petitioned the court for temporary custody after the mother had refused to give them access to the child for a time. In a pendente lite order issued in April 2002, the court denied the maternal grandparents' petition for custody, instead granting custody to the mother and giving the maternal grandparents only visitation rights. The father learned of this legal proceeding only after he received notice of the judge's order. He then intervened and, as a result, initially was awarded regularly scheduled visitation with the child. Unsatisfied with mere visitation rights, however, the father entered into negotiations to obtain custody and, through mediation, he, the mother, and the maternal grandparents came to an agreement in August 2002 that both parents should be awarded joint legal and physical custody. The trial court entered an order adopting that agreement. Tragically, however, in October 2002 the mother overdosed on heroin. The father and the maternal grandparents filed a petition with the trial court for emergency ex parte relief, seeking temporary removal of custody from the mother as a result of her inability to care for the child. The mother did not contest the petition, and the trial court granted it in November 2002, removing the mother's joint custody rights and granting temporary joint custody to the maternal grandparents, while not disturbing the father's preexisting joint custody rights. Then, in February 2003  after it had become clear that the mother would not soon be fit to regain joint custody and when the maternal grandparents asserted a superior right to custody over the father  the father took action to preserve his parental rights by petitioning the trial court for sole custody, which petition initiated the instant case.
Thus, the record shows a consistent pattern of behavior on the part of the father of voluntary petitions to the court for increased recognition of his paternal rights, *684 including the right to custody (initially joint and later sole), as he became aware of the extent of his rights as a father of an illegitimate child. This pattern of increased understanding and assertion of parental rights over time is exactly the opposite of what would be required for a legitimate finding of voluntary relinquishment.
In fact, the closest the record comes to showing that the father voluntarily relinquished his right to sole custody is delay in fully asserting that right. Specifically, the father waited for four months, from October 2002 until February 2003, to assert his full prima facie rights by petitioning the trial court for sole custody. Yet that delay is hardly unreasonable, given hopes that the mother would recover from her drug overdose and that her joint custody rights would be restored.[23]
Indeed, delaying legal action under the circumstances was a kindness to the mother and to the child. It was kindness to the mother, that she might not despair of complete loss of her child while recovering from the drug overdose. It was also a kindness to the child, already disturbed by a sudden loss of any interaction with his mother as a result of the overdose, because it allowed the child to remain in the comfortable familiarity of the maternal grandparents' home.
Under the circumstances, if the father had done what the main opinion now says he should have done  that is, petitioned for sole custody the first instant it was possible  the trial court likely would have refused, understandably finding the advocacy of another such abrupt shock to the child to display a lack of concern for the child's best interests. Thus, the holding of the main opinion forces the father into a Catch-22: he loses if he asserts his full custody rights as soon as possible or he loses if he delays as would be better for the child.
The holding of the main opinion not only puts the father in an impossible situation, but it also does so without any legal support and without any cited precedent of this Court.[24] The essence of this holding *685 is that one who possesses joint custody of a child and waits four months after the opportunity first presents itself to petition for sole custody has "knowingly," "intentionally," and "voluntarily" "surrendered" his right to any custody. This holding not only is unsupported but also is flatly contradicted by the authority of Ex parte D.J. Therefore, it is fundamentally unjust and should not stand.

VIII.

Avoiding the false dichotomy of parental rights versus a child's safety, well-being, and welfare.
Justice Bolin's special concurrence appears to imply that the diligent protection of parental rights at some point comes at the detriment of a child's safety, well-being, and welfare, as though the two were mutually exclusive. I believe otherwise. In fact, I believe the best interests of a child are served by strengthening the state's acknowledgment of, and deference to, parental rights, because God has specially and uniquely equipped parents to raise their children so that any parent who possesses at least some love can care for his or her child better than the state, which by its nature cannot love. Consequently, the best interests of children are served by the state's declining to interfere with family government merely because its agents can, in individual cases, conceive of ways to improve the lot of a particular child.
I believe what may particularly trouble some of my colleagues in this case is that this Court's current standard in Ex parte Terry, if faithfully applied, leads to an outcome they regard as unjust. Faced with upholding the standard and causing apparent injustice, or seeking justice at the cost of the standard, they have chosen the latter. Rather than directly acknowledge that our standard has been found wanting, however, they have honored it in form while gutting it in fact by following what I consider to be the lower court's subversion of the standard. Although such an approach may appear to help in an individual case, it will cause more hurt than help in the end, because the subversion of the language of the law inevitably undermines the authority of the law.
There is a better way. If an existing court standard is found to hinder rather than promote justice as defined by a higher authority, we may, and should, refine or, if needed, even replace, our standard. And one way to do so in a custody case like this one is to distinguish between those parents who have established their right to noninterference by the courts by founding their own family governments through marriage and those parents who have not. Recognizing such a distinction clarifies and corrects our standards with respect to determinations of voluntary relinquishment and fitness.
With respect to "voluntarily relinquishment," natural parents who have founded family governments by marriage covenant should never be found by courts to have relinquished their custody or other parental rights apart from a definitive and unambiguous act such as a signed writing to that effect, as when children are given up *686 by natural parents for adoption. Natural parents who have not founded their own family governments by marriage covenant, however, have not established their right of state noninterference and thus should be subject to something akin to a "presumptive waiver" standard. Under such a standard, implied by the main opinion and special concurrences in this case, a non-married natural parent's extended delay in fully asserting his or her parental rights may be treated as a waiver of those rights.
Similarly, with respect to court adjudication of parental fitness, married parents, as founders of a family government, should be able to raise their children unfettered by state government interference, whether by court or agency action. As the Ex parte Terry "clear and convincing" standard will sometimes too easily permit state interference in the separate jurisdiction of family government, its application at most should be limited to narrow, defined areas, specifically: neglect to the point of actual abuse, tortious wrongdoing, or criminal acts on the part of parents. State involvement in these specific areas is permissible, because in these cases parents have acted improperly outside their jurisdiction and thereby subjected themselves to the state's sword of justice. Where an unwed natural parent has declined the separate jurisdictional protection afforded by marriage, by contrast, the courts should be free to apply the standard of review to any factor affecting fitness, as in the case before us.
I believe refining our standards to distinguish between married parents and unwed parents in the manner specified above increases justice for parents and children alike while simultaneously acknowledging and honoring the separate governing jurisdiction of the family established by our Creator. Moreover, by returning to first principles, the refined standard also avoids the false dichotomy of choosing between upholding family government by judicial non-interference and protecting children by necessary and lawful court involvement.

IX.

Conclusion.
I am very sympathetic to the hardships illegitimate children face in Alabama today, and I am particularly sympathetic to the circumstances of the child in the case before us. But the law recognizes that parental authority is ordained by God as a governing sphere distinct from that of the state and, consequently, that parents or guardians, not state officials or courts, generally know what is best for, and act in the best interest of, their children. Furthermore, my personal feelings of sympathy for the child in this case do not relieve me of my obligation to interpret and apply the law and lawful precedents as they have come down to us, absent a higher, superseding authority or clear error in the caselaw standards. And what has come down to us requires both a parent's knowledge of a particular right to custody and an act intentionally and voluntarily forfeiting that custody for a finding of "voluntary relinquishment." Because neither knowledge of a right to sole custody nor an intentional act is present in this case, the appropriate conclusion under Alabama law is that the trial court improperly invoked the standard to justify stripping the father of his right to custody of his son.
Furthermore, although I recognize that sound reasons may exist to justify the loss of an unwed father's custody rights if he waits an extended period to assert them, that issue is not before this Court under applicable statute, precedent, or procedure in this case. But even if the issue were properly before this Court, we should not determine the outcome by upholding the lower court's twisting of the plain legal meaning of the term "voluntary relinquishment." *687 Instead, we should apply the existing standard as is in this case and articulate a refined standard to apply in future cases. By giving parents, legal counsel, and the lower courts clear notice of changed standards, we promote in the law right ends as well as right means to those ends  both of which are necessary for justice to be maintained for adults and children alike.
Although the main opinion and the other special writings regrettably have not given explicit notice of what I regard to be a clear shift in this Court's standards, I believe this case reveals an emerging consensus recognition that, in the words of Justice Bolin, parents possess a fundamental "God-given right and responsibility to rear their children ... unfettered by state interference," 924 So.2d at 667, that this right is secured by parents who have established family governments by marriage covenant, and that unwed parents who fail to take responsibility to promptly assert their parental rights may be presumed to have waived them.
NOTES
[1] Unfortunately, because of the trial court's heavy docket, the hearing was conducted over a period of time. Testimony was presented to the trial court ore tenus on March 3, 2003, May 22-23, 2003, and September 8, 2003.
[2] As Justice Parker notes in his dissent, the maternal grandparents sought joint custody, not full custody, of the child. They testified that the father should be part of the child's life. However, the father requested sole custody rather than joint custody with the maternal grandparents, which changed the nature of the proceedings and "solicited" the trial court's review of his custody rights.
[3] The father admitted at the hearing that in his deposition he stated that "it just was not a top priority to have [the child] legitimized." The father also admitted that the paternal grandparents, who did not learn about the child until the child was seven months old, "brought up" the subject of legitimizing the child. The father admitted that despite the fact that he was 27 years old and working full-time, he did not have the money to pay for the legitimation so the paternal grandfather paid the $200 filing fee. The father stated that he subsequently repaid the paternal grandfather.
[4] Justice Parker in his dissent maintains that the evidence does not establish that the father knew of his right to custody and that he voluntarily and intentionally relinquished custody. First, every man is charged with knowledge of the law, see Atkins v. Parker, 472 U.S. 115, 130-31, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985)("All citizens are presumptively charged with knowledge of the law . . . . The entire structure of our democratic government rests on the premise that the individual citizen is capable of informing himself about the particular policies that affect his destiny."); therefore, the father's ignorance of the law does not justify his not exercising his right to custody once he had his son legitimized in the probate court.

Moreover, the father's actions and admissions clearly establish that he knew that he could have exercised his right to custody. The father "had a gut feeling" when the mother informed him that she was pregnant that the child was his child, and he was happy about the child. The father visited the child within two weeks of the child's birth and at that time discussed having a paternity test performed. Within two months of the child's birth in June 1999, a paternity test was conducted that conclusively established that he was the father. The father visited the child in August 2000, during the child's first year and legitimated the child when the child was 16 months old. The father admitted that he knew in September 2000 that the mother had given the maternal grandparents' decision-making authority regarding the child through a power of attorney and that he did not object or request custody of the child at that time. He admitted that in February 2002 he went with the maternal and paternal grandparents to an attorney's office to discuss the mother's conduct. The father admitted that he did not interject into the discussion that he wanted custody of the child and that at that time he wanted the child to stay with the maternal grandparents. Indeed, even the father recognized that he was charged with a responsibility to find out his rights to custody of the child because when he was asked why he did not take steps to gain custody of his child when the child was not living with him or the mother, the father responded, "I didn't know what my rights were and I didn't  I didn't further investigate anything." (Emphasis added.) These admissions by the father and his interaction with the legal system during the child's first three years of life clearly establish that the father knew and had an opportunity to investigate and establish his right to custody of the child. This observation of the father's knowledge of custody and yet his refusal to assert it is bolstered by the admission of the paternal grandmother that she and the father realized the father could have at any time asserted his right to custody. Clearly, the father and the paternal grandmother realized he had rights to the child, but the father decided not to investigate and determine how to exercise those rights.
Justice Parker maintains that "the record shows a consistent pattern of behavior on the part of the father of voluntary petitions to the court for increased recognition of his paternal rights, including the right to custody (initially joint and later sole), as he became aware of the extent of his rights as a father of an illegitimate child." 924 So.2d at 683-84. While the record does exhibit a gradual increase in the father's interest in the child, the record clearly establishes that the father's interest is limited to spending more time with his child, that is, receiving more liberal visitation. None of the facts establish an increased role of the father in the day-to-day decision-making and care for the welfare of the child  that is, a desire for full custody of the child. For example, the father admitted that instead of taking the child to the doctor when he noticed, during a visitation that occurred between the May and September hearing dates, that his child was ill he asked the maternal grandmother to set up the appointment and take the child, because "it was a convenience thing." Indeed, the record clearly establishes that the only reason he petitioned the court for full custody of his child was because he believed that his visitation with the child had been unjustly limited by the maternal grandparents. The father unequivocally replied at the hearing when asked if he thought custody should be awarded in full to him then, "no." While the record repeatedly establishes that the father does want to increase the amount of visitation he has with his child, it also unequivocally establishes that his petitions to the court are a product of his desire to have the convenience of more liberal visitation, not the responsibility of full custody.
[5] Justice Parker in his dissent maintains that the trial court impermissibly shifted the burden of proof to the father to prove that he is fit to have custody. In support of his contention, he relies on the following clause in the trial court's order, "[The father] has succeeded in giving this court not one positive reason to place the child in his custody." The trial court's statement in its entirety reads, "He hasn't a clue where his money goes, his mother continues to dominate most if not all of the aspects of his life, he cannot manage this four-year-old child alone and has succeeded in giving this court not one positive reason to place the child in his custody." (Emphasis added.) The trial court's observation that "the father has succeeded in giving this court not one positive reason to place the child in his custody" indicates the trial court's recognition that the father can present evidence to rebut the evidence indicating unfitness. Such a statement, in light of the detail in the trial court's order, does not indicate an improper shifting of the burden of proof.
[6] Psalms 127:3-5.
[7] For example, swabs of tissue taken from the mouths of both parents and the newborn infant can be tested allowing an early determination as to biological parentage that was formerly unavailable.
[8] Under the Uniform Parentage Act, a putative father may file an action to establish his paternity before the birth of the child. See § 26-17-6, Ala.Code 1975. This act also provides protections for the rights of unwed fathers. See § 26-17-3, Ala.Code 1975 ("The parent and child relationship shall extend equally to every child and to every parent, regardless of the marital status of the parents.").
[9] The Putative Father Registry Act allows a putative father to file notice of his intent to claim paternity, which may later be revoked, before the birth of the child.
[10] I do not agree with Justice Smith's statement that a reversal of the trial court's determination that the father is unfit would by virtue of the law-of-the-case doctrine foreclose the trial court from considering the father's fitness in a later custody proceeding. 924 So.2d at 665. As the main opinion and Justice Smith recognize, the law-of-the-case doctrine holds that "whatever is once established between the same parties in the same case continues to be the law of that case...." Blumberg v. Touche Ross & Co., 514 So.2d 922, 924 (Ala.1987). A reversal of the trial court's finding of unfitness is not the same as a finding of fitness; such a reversal would not establish, as the law of the case, that the father is a fit parent.
[11] As the main opinion acknowledges, a "parent may, after being found unfit, become a fit parent and at that time seek custody of the child." 924 So.2d at 660.
[12] Ex parte Berryhill, 410 So.2d 416, 417 (Ala. 1982), upon which Ex parte Terry rests, requires clear and convincing evidence of the unfitness of a parent for the parental presumption to be overcome. See also Chandler v. Whatley, 238 Ala. 206, 209, 189 So. 751, 754 (1939). In Ex parte Terry, we expressly stated that "[t]he standard to be applied in this case is that applied by this Court in Ex parte Berryhill ...." 494 So.2d at 632.
[13] Of the more than 7,100 released decisions included in the Court's internal database covering primarily the past three years, this is the first case in which Justices of the Court have issued seven separate opinions.
[14] Our courts already give great deference to the separation of powers within the state sphere of government. See, e.g., Birmingham-Jefferson Civic Ctr. Auth. v. City of Birmingham, 912 So.2d 204, 222 (Ala.2005) (Parker, J., concurring specially and emphasizing the right and responsibility of each of the branches of state government to interpret the Constitution for itself). Yet the Founders considered division of government power to be so vital for the preservation of liberty and justice that they separated state government power not only horizontally, among the legislative, executive, and judicial branches, but also vertically, between the states and the federal government.

In fact, the government of the United States was formed in a deliberate separation of powers by the states. The states delegated to the federal government powers that were particularly limited by their express enumeration as well as generally limited by the Tenth Amendment to the United States Constitution: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the states, are reserved to the states respectively, or to the people."
As our constitutional republic aligns the rights of the states with the rights of the people, it is unsurprising that as many of the rights of the states have been eroded or lost altogether so, too, have many of the people's rights been eroded or lost altogether. Thus, those who would preserve and recover individual rights must be equally zealous to preserve and recover states' rights and the rights of the other government spheres  the family and the church.
[15] Federal tax laws also reflect the state's recognition that the church is a distinct and independent sphere of government, accountable for its affairs to God rather than to the state. Thus, by statute churches are automatically "nontaxable." They are not required to incorporate, to seek official recognition by the Internal Revenue Service ("the IRS") to avoid paying federal taxes, or to file annually. (See 26 U.S.C. § 6033(a)(2)(A) and 26 U.S.C. § 508(c).) This is in contrast to every other kind of nonprofit organization, which must incorporate, must obtain IRS approval under a specific provision of the Internal Revenue Code (e.g., 26 U.S.C. § 501(c)(3)) before qualifying as "tax-exempt," and must file annually to preserve that state-granted exemption.
[16] In the original Greek language, machairan, the word translated here as "sword," referred specifically to the double-edged blade used for capital punishment. It represents the ultimate expression of the authority of the state, the proper jurisdiction of which is the execution of justice.
[17] See Edmund Burke, Reflections on the Revolution in France (1790)(contrasting the lawful means Americans used to achieve independence from Britain with the unlawful means the French revolutionaries used to overthrow their government).
[18] In the Declaration of Independence, our Founders declared that fundamental human rights are "endowed by our Creator" and thus "unalienable." Article 1, § 1, Alabama Constitution 1901, similarly recognizes that our "inalienable" rights are from God.
[19] The main opinion contends that "in light of the detail in the trial court's order," this statement by the trial judge "does not indicate an improper shifting of the burden of proof" because it merely "indicates the trial court's recognition that the father can present evidence to rebut the evidence indicating unfitness." 924 So.2d at 660 n. 5. This interpretation is not persuasive, however, because the trial judge did not give the father notice that his fitness for any custody at all was on trial.

As far as the father knew, the only issue at trial was his fitness for sole custody, because that is what he had petitioned the court for and because no other party in the case had requested that he lose the joint custody he then possessed. It was not until the trial judge's order that the father could have known of his prospective loss of all custody rights, at which time it was too late for him to "present evidence to rebut the evidence indicating unfitness [for any custody]."
[20] The main opinion argues that the "admissions by the father [that he did not know what his rights were and did not investigate to find out] and his interaction with the legal system during the child's first three years of life clearly establish that the father knew and had an opportunity to investigate and establish his right to custody of the child." 924 So.2d at 659 n. 4. I agree that the record shows the father knew he had an opportunity to investigate his paternal rights. But this level of knowledge falls short of the governing Ex parte D.J. standard in two ways.

First, knowledge of an opportunity to investigate possible rights is not the same as knowledge of a right. Second, knowledge of the existence of paternal rights generally, or even knowledge of a right to joint custody, is not the same as knowledge of a right to sole custody, which is at issue in this case because the father already possessed, and had not relinquished, joint custody at the start of the proceedings in the instant case. In this case, although the record shows a father with some knowledge of his rights, it does not show, and the main opinion does not establish, that the father knew he had a prima facie right to sole custody following the mother's drug overdose.
[21] The main opinion seeks to sidestep the requirement of Ex parte D.J., 645 So.2d at 306, that the father must be aware of his right before he can possibly relinquish it by stating that as a citizen the father "is charged with knowledge of the law." 924 So.2d at 658 n. 4. In support of this statement, the main opinion cites Atkins v. Parker, 472 U.S. 115, 130-31, 105 S.Ct. 2520, 86 L.Ed.2d 81 (1985), for the proposition that our form of government "rests on the premise that the individual citizen is capable of informing himself about the particular policies affecting his destiny."

Atkins is inapplicable to the instant case, however, for at least two reasons. First, the plaintiffs in Atkins faced a reduction in state-granted benefits rather than a loss of God-given rights. Second, the plaintiffs in Atkins received actual notice of the planned benefits reduction and of the opportunity of a hearing to contest it, whereas the father in this case did not receive advance notice of the prospective loss of all his custody rights, because no party had requested it. Consequently, the father had no opportunity to contest such loss before the judge's order depriving him of his rights.
[22] The main opinion considers it significant that the father did not consider it "a top priority" to petition the court to formally legitimate the child immediately after the paternity test he had requested confirmed that he was the father and also significant that the father "admitted" he did not even consider legitimation until his parents brought up the subject. I consider it more natural for the typical nonlawyer not to know that a court-sanctioned legitimation procedure has any special significance, because paternity in this case had already been established by science and because the common, historic understanding of legitimation is that it first requires marriage.
[23] The main opinion cites Ex parte D.J. for the proposition that the starting point for evaluating possible voluntary relinquishment of custody should be August 2000, when the probate court legally recognized the father's paternity. However, Ex parte D.J. does not stand for this proposition; rather, it stands for the proposition that an unwed father who delays three years until the death of the child's mother to initiate legitimation and custody proceedings does not voluntarily forfeit his prima facie right to custody over the maternal grandmother with whom the mother and child had lived if he initiates those proceedings soon after the mother's death.

Under Ex parte D.J., the time for a father to assert his presumptive right to custody should start running, for possible voluntary-relinquishment purposes, only after the mother has lost her custody because of the "`strong presumption in Alabama'" that "`the mother of a child born out of wedlock has a superior right of custody over all other persons,'" including the unwed father. 645 So.2d at 307 (quoting Rainer v. Feldman, 568 So.2d 1226, 1227 (Ala.1990)). According to the D.J. Court, the father's "promptness in initiating legitimation proceedings and in seeking custody after [the mother's] death conclusively rebuts any contention that he relinquished custody rights...." 645 So.2d at 307.
The promptness to which the D.J. Court refers was the start of legal action within three months of the mother's death. If three months was sufficiently prompt in a case in which it was clear the mother could never regain custody because she was dead, then four months, as in the case before us, should be considered sufficiently prompt where the mother yet lives.
[24] The closest the main opinion comes to supporting authority is its appeal to a nonbinding, lower-court case, K.C. v. D.C., 891 So.2d 346, 349 (Ala.Civ.App.2004), which found a father to have voluntarily relinquished custody in what the main opinion calls a "similar situation." 924 So.2d at 658. However, the circumstances the main opinion calls "similar" include a delay of four years rather than four months in the father's assertion of his prima facie right to custody over the maternal grandparents following the mother's loss of her custody rights. During those years, moreover, the father in K.C. did not possess even joint custody, unlike the father here. I consider these differences to be material even if, arguendo, one considers a lengthy delay in assertion of custody rights to be equivalent to voluntary relinquishment, which I do not.